John D. ROTH, Jr., Respondent,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Appellant.

No. WD 50194.

Missouri Court of Appeals, Western District.

Oct. 24, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 5, 1995.

Application to Transfer Denied Jan. 23, 1996.

585

R.B. Miller and Jeffrey P. Ray, Lathrop & Norquish, Kansas City, for appellant.

David L. Blunt and John H. Leskera, Blunt & Schum, Edwardsville, IL, for respondent.

Before BERREY, P.J., and ULRICH and ELLIS, JJ.

ELLIS, Judge.

This is an action for personal injuries pursuant to the Federal Employers' Liability Act ("FELA").[1] The Atchison, Topeka and Santa Fe Railway Company ("Santa Fe") appeals the trial court's denial of its motion for judgment notwithstanding the verdicts and entering judgment in favor of John D. Roth, Jr. ("Roth"). We affirm.

Roth worked for Santa Fe as a trackman. He built and maintained track along the San-

1.  45 U.S.C.A. § 51 (1986).

ta Fe rail lines; this was heavy work requiring considerable lifting. On May 2, 1990, Roth was working under the supervision of Leroy Rosebraugh, a track foreman for Santa Fe. A work crew consisting of Roth and two other men was assigned the task of replacing wooden planks in grade crossings near Augusta, Kansas. At this time in 1990, Santa Fe utilized two methods for removing the old planks in preparation for new, replacement crossing planks. The planks were either lifted and removed manually, using a set of tie tongs and a lining bar or by machine, consisting of a boom on a truck that operated like a crane. On May 2, 1990, although the truck boom was available, the work crew was instructed to manually remove the crossing planks. Roth did not request to use the truck boom to remove the planks because he was worried about being charged with insubordination by Foreman Rosebraugh. Rosebraugh expected the laborers to carry out his orders as directed or else they were considered insubordinate and could be cited for violating Santa Fe rules; insubordination could result in discharge from Santa Fe's employment. However, Roth did ask a co-worker, Mr. William Phillips, why the crew was removing the planks by hand rather than by machine. He was told on Foreman Rosebraugh's crew, "that's the way its [sic] done."

A railroad crossing plank weighs approximately 360 pounds. Removing a plank by hand requires the person using the tie tongs to bend over in an awkward, uncomfortable position, grasp the end of the plank with the tie tongs, and lift it high enough to insert a lining bar under the plank. The plank is then lowered onto the lining bar and "rolled" out from under the train rails. In comparison, when removing planks with the truck boom, a chain is wrapped around the plank and the plank is lifted by the boom, rather than by a worker. On May 2, 1990, Roth was using the tie tongs to lift a crossing plank when he felt "extreme pressure" in his lower back. He handed the tongs to a coworker and tried to "walk off" the discomfort. Despite the urging of a co-worker, Roth did not report the incident or injury to

Foreman Rosebraugh. Roth completed his work week by working the following two days and was then off for the weekend. Roth returned to work Monday, May 7, 1990 and began his new work week.

On May 8, 1990, Roth was again assigned to work on grade crossings near Augusta, Kansas. His supervisor was Foreman Louis Fox. That morning, Roth and the two other members of the work crew were instructed to remove crossing planks by hand. One of Roth's co-workers asked Foreman Fox to use the boom truck but was informed it was not working. However, the record reveals that the boom truck was available and working. Nevertheless, Foreman Fox directed that the planks be removed by hand using the tie tongs and lining bar. Roth testified his back was still sore from the May 2, 1990 incident, but he was able to complete the task even though his pain grew worse as he worked. Later in the day, the crew was "gauging track" which required Roth to drive spikes with a spike maul.[2] Roth had driven several spikes and was driving another when he heard his back pop; his pain suddenly increased. He was unable to straighten his back into an upright position without the help of his two co-workers. Roth immediately reported this incident and injury to Foreman Fox. However, he declined an offer to see a doctor. Roth worked two more days before he was layed off (for reasons unrelated to his reported injury).

After he was layed off, Roth's back condition became progressively worse with pain radiating from the lower back to his left leg. He began taking prescriptions and receiving physical therapy treatment from his family doctor, Dr. Steven Thompson. In July, 1990, he was referred to an orthopedic surgeon, Dr. Richard Wendt. Dr. Wendt diagnosed a ruptured or herniated lumbar disc and continued the conservative treatment, hoping to avoid surgery. In August 1990, Roth was sent by Santa Fe for a second opinion. He was sent to Dr. Theodore Sandow, another orthopedic surgeon. After examination, Dr. Sandow concluded surgery would help allevi-

ate Roth's symptoms. Therefore, by October 1990, when the conservative treatment proved unsuccessful, Dr. Wendt surgically removed the herniated L4–5 disc. After surgery, Roth slowly improved. He was eventually released for light-duty work in January 1992. However, to prevent a recurrence of Roth's back problems, Dr. Wendt prohibited work requiring repetitive bending, stooping, and lifting in excess of twenty pounds. Also, to prevent pain, Roth should avoid long periods of sitting by taking breaks every thirty minutes to change his position. Dr. Wendt anticipated these work restrictions would be permanent. Near the time of trial, Santa Fe employed an independent medical examiner, Dr. Ernest Neighbor, who examined Roth. After the examination, Dr. Neighbor agreed that Roth's work restrictions were appropriate for his injury and were permanent in nature.

On December 28, 1992, Roth filed his petition alleging Santa Fe's negligence caused his injuries. Roth's petition asserted two counts of negligence; one count addressed the incident of heavy lifting on May 2, 1990 and the other count addressed the incident of heavy lifting on May 8, 1990. A jury trial was held, and the jury awarded Roth damages of $400,000 for the May 2, 1990 incident, and $360,000 for the May 8, 1990 incident. Santa Fe timely moved for judgment notwithstanding the verdicts (j.n.o.v.), and in the alternative a new trial or remittitur. Santa Fe's post-trial motions were denied without opinion. Santa Fe now appeals, raising three points of error. Santa Fe contends the trial court erred in 1) not granting its motion for j.n.o.v. because Roth failed to adduce sufficient evidence to establish Santa Fe was negligent on either May 2, 1990 or May 8, 1990; 2) giving Roth's verdict directors because the instructions were not fully supported by the evidence; and 3) giving Roth's jury instructions because such instructions violated the due process, equal protection, and supremacy clauses of the United States Constitution and Missouri Constitution because they did not allow the jury to record findings as to percentages of fault between

2. When "gauging track," one rail is spiked down to the railroad ties, a gauge is placed on both rails to identify the location of the spikes for the other rail, and that rail is secured by spikes driven into the ties.

the parties as in all other Missouri comparative fault cases.

■■■ Roth brought suit against Santa Fe pursuant to the FELA, 45 U.S.C.A. § 51, which provides in pertinent part:

Every common carrier by railroad while engaging in commerce between any of the several States or Territories ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works ... or other equipment.

For its first point, Santa Fe contends the trial court erred in not granting its motion for j.n.o.v. because Roth failed to adduce sufficient evidence to establish Santa Fe was negligent on either May 2, 1990 or May 8, 1990. At the outset, it is imperative we set forth the standards by which we review this jury-tried FELA case. Actions brought under the FELA are governed by federal law. *Stewart v. Alton & S. Ry.*, 849 S.W.2d 119 (Mo.App.1993). This includes the question presented by Santa Fe whether Roth adduced sufficient evidence to make a submissible case for the jury. *Hertzler v. Burlington N. R.R.*, 720 S.W.2d 762 (Mo.App.1986). The test in an FELA case is:

[W]hether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes ... Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence played any part at all in the injury or death.... [I]f that test is met, [judges] are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities.

*Rogers v. Missouri Pac. R.R.*, 352 U.S. 500, 506–07, 77 S.Ct. 443, 448–49, 1 L.Ed.2d 493 (1957). As Santa Fe asserts error in denial of its motion for judgment notwithstanding the verdicts, which presents the issue whether Roth made a submissible case, "we review the evidence in the light most favorable to [Roth] and accord him all reasonable beneficial inferences which can be drawn from it." *White v. Union Pac. R.R.*, 871 S.W.2d 50, 52 (Mo.App.1993). A motion for judgment notwithstanding the verdict can only be sustained if reasonable minds could not differ. *Id.* In addition, we are reminded that only "slight or minimal" evidence is necessary to create a jury question on the issue of Santa Fe's negligence. *Zibung v. Union Pac. R.R.*, 776 S.W.2d 4, 5 (Mo. banc 1989). Therefore, unless there is a complete absence of probative facts to support the jury's findings that Santa Fe was negligent, we cannot say the trial court erred. *Stewart*, 849 S.W.2d at 124.

■■■ For its first subpoint, Santa Fe contends Roth failed to adduce legally sufficient evidence to submit a case of FELA negligence for the events on May 2, 1990 or May 8, 1990. Specifically, Santa Fe asserts evidence that using a truck boom was easier and safer than manually removing crossing planks was inadequate to support a jury submission on negligence. Further, Santa Fe alleges Roth adduced no evidence that his work on May 8, 1990 was in any respect "not reasonably safe" as required under FELA. In our discussion of whether Roth made a submissible case of negligence, we will collectively examine the evidence supporting the May 2, 1990 incident and May 8, 1990 incident. With regard to both incidents, the trial court instructed the jury to determine whether Santa Fe was negligent in any one or more of the following respects; that Santa Fe failed to provide either (a) reasonably safe conditions for work, (b) reasonably safe appliances, or (c) reasonably safe methods of work. In addition, for the May 8, 1990 incident only, the jury was instructed to determine whether Santa Fe was negligent for failing to provide reasonably adequate help (ground (d)).

With respect to ground (a), Santa Fe's duty to provide reasonably safe conditions for work contemplates that Santa Fe will take "precautions commensurate with the dangers to be encountered in the circumstances" with the question of reasonableness depending "upon the danger attending the place or the machinery." *Qualls v. St. Louis S.W. Ry.*, 799 S.W.2d 84, 86 (Mo. banc 1990) (citations omitted). Furthermore, the duty to provide reasonably safe conditions for work requires Santa Fe "to eliminate those dangers that could be removed by the exercise of reasonable care...." *Id.* From our review of the record, we find evidence from which the jury could reasonably conclude Santa Fe failed to provide reasonably safe work conditions for Roth. Roth was employed as a trackman; a job requiring repeated bending, stooping, and heavy lifting. Santa Fe's claim agent, Phil Brady, testified common sense indicates extremely heavy lifting can injure a person's back. Brady further testified such injuries could be prevented by using a truck boom. And yet, testimony from various sources revealed that Roth and his co-workers on both May 2, 1990 and May 8, 1990 were required to engage in replacing extremely heavy crossing planks by *manually* lifting and moving them even though some form of mechanical lifting device was available (such as a truck boom, swing boom, and/or backhoe). Roth testified that in order to manually lift and hold up the crossing planks, he had to stand in an awkward, uncomfortable position. Furthermore, as several witnesses agreed, it is considerably easier and safer to remove crossing planks with a truck boom. From this evidence and all reasonable inferences drawn therefrom, the jury was entitled to believe Santa Fe knowingly allowed and/or placed Roth at risk of back injury by requiring him to remove crossing planks by hand rather than utilizing the available mechanical lifting equipment which could have eliminated Roth's dangerous work conditions. *See Zibung*, 776 S.W.2d at 5. The jury could reasonably find Santa Fe failed to provide Roth a reasonably safe workplace.

As to ground (b), Santa Fe misses its mark when it argues there was nothing defective about Roth's work tools. Santa Fe's duty to provide reasonably safe appliances extends to providing the *proper* tools for employees to work safely, not just tools free from defects. The issue is not whether the tie tongs, lining bar, and other hand tools Roth used were in good condition and "safe" for use. The issue is whether providing Roth and his co-workers with tie tongs and a lining bar to remove extremely heavy crossing planks was the proper assortment of tools to safely perform the assigned task. *See generally Hertzler v. Burlington N. R.R.*, 720 S.W.2d 762 (Mo.App.1986) (railroad company's failure to provide the *proper* headlamp was basis for negligence claim and supported injured employee's recovery under FELA). As noted, *supra*, Santa Fe's claim agent acknowledged that repetitive heavy lifting can cause back injuries. Furthermore, he admitted employee back injuries could be avoided by using a truck boom to lift and move crossing planks. The evidence shows mechanical devices were available on May 2, 1990 and May 8, 1990 to assist Roth in removing the crossing planks; neither day presented a situation where it was necessary for the task to be completed by hand.[3] The evidence supports the jury's conclusion that Santa Fe failed to provide reasonably safe appliances for Roth and his co-workers on May 2, 1990 and May 8, 1990. Santa Fe knew or should have known that Roth could be harmed by manually lifting and moving the crossing planks. Nevertheless, it chose to supply Roth and his co-workers with hand tools; tools that were inadequate (unsafe) to complete the assigned task, despite the fact that safer means were readily available.

With respect to ground (c), the record is replete with evidence to support a jury finding that Santa Fe failed in its duty to provide reasonably safe methods of work. As we concluded in our discussion of ground (a) and (b), *supra*, requiring trackmen to manually lift and move crossing planks unreasonably subjects them to risks of back

---

3. For example, when a work crew is unable to obtain "track and time" to complete a project (which would allow them to place a truck boom or other mechanical lifting device on the tracks), in an emergency situation they may be required to remove crossing planks by hand.

injury. In addition, the jury heard evidence of alternative methods of removing crossing planks. Roth testified that during his first week of work in the Augusta, Kansas area, while working under Foreman John Bright, he removed crossing planks using a truck boom and a speed swing. The record also reveals some mechanical lifting device, whether a truck boom, speed swing, or backhoe was available for use on both May 2, 1990 and May 8, 1990. Furthermore, even though the considerably easier and safer mechanical method of lifting was readily accessible, Foreman Rosebraugh (on May 2, 1990) and Foreman Fox (on May 8, 1990) ordered their work crews, including Roth, to remove crossing planks by hand. "The question of alternative methods are facts to be considered by the jury in determining whether ... the method used by [Santa Fe] was reasonably safe and whether ... other methods could have been easily adopted." *Welsh v. Burlington N. R.R.*, 719 S.W.2d 793, 796 (Mo.App.1986). Based on the evidence and all reasonable inferences the jury was permitted to draw therefrom, it was not unreasonable for the jury to find Santa Fe failed to provide Roth with reasonably safe methods of work. Ground (d) is an allegation of negligence pertaining solely to the May 8, 1990 incident. Roth alleged Santa Fe failed to provide reasonably adequate help to perform the task of lifting and moving crossing planks. Again reviewing the evidence in the light most favorable to the verdict and disregarding all contrary evidence, we find the evidence sufficient to support a jury finding that Santa Fe failed to provide Roth with adequate help on May 8, 1990. Roth testified the safe removal of crossing planks requires four people. One person with tie tongs must lift up the crossing plank. Another wedges a lining bar beneath the center of the crossing plank to enable the plank to be rolled out from under the rail. And finally, while the first two are holding and centering the crossing plank, two other people roll the crossing plank out from under the rail. The evidence was uncontroverted that on May 8, 1990, Roth was assisted by only two crew members, trackman Bill Hart and an unnamed truck driver. Clearly, the jury had evidence before them that Roth's crew was shorthanded. Furthermore, considering the risks associated with manually removing crossing planks, it was reasonable for the jury to conclude Santa Fe was negligent for failing to provide Roth with adequate help. *Keith v. Burlington N. R.R.*, 889 S.W.2d 911 (Mo.App.1994), presents a similar situation. A railroad employee (Marshel Keith) was injured while stacking railroad ties that were being removed from a bridge. Keith introduced evidence that the safe practice required two men to stack the ties. However, the day Keith was injured, the railroad had not replaced a man who was on vacation which left Keith working by himself. Keith submitted the railroad failed to provide reasonably adequate help, and the jury rendered a verdict in his favor. On appeal, the court found the evidence sufficient to support the jury's verdict. As in *Keith*, we too find sufficient evidence to support a jury finding that Santa Fe failed to provide Roth with reasonably adequate help.

Santa Fe's second subpoint alleges the trial court erred in denying its motion for j.n.o.v. because Roth failed to adduce expert medical evidence causally connecting the May 8, 1990 incident with his back injury. Roth's "burden of establishing causal connection is met when there is evidence, even though entirely circumstantial, from which the jury may with reason make the inference that [Santa Fe's] negligence contributed in *any* way to [Roth's] injury." *Hertzler*, 720 S.W.2d at 768 (emphasis added). Clearly, causation in an FELA case differs significantly from a "normal" negligence case. Under the FELA, if Santa Fe's negligence is the *slightest* cause of Roth's injury, liability is established. *Ewing v. St. Louis S.W. Ry.*, 772 S.W.2d 774, 776 (Mo.App.1989) (citing *Rogers*, 352 U.S. at 506–07, 77 S.Ct. at 448–49). In addition, "because this is a FELA suit, fact questions, to the maximum extent proper, shall be left to the jury." *Mateer v. Union Pac. Sys.*, 873 S.W.2d 239, 241 (Mo. App.1993) (citing *Rogers*, 352 U.S. at 509, 77 S.Ct. at 450). Finally, we must bear in mind our treatment of the FELA causation issue in *Foltz v. Burlington N. R.R.*, 689 S.W.2d 710 (Mo.App.1985). In *Foltz*, we relied on *Sentilles v. Inter–Caribbean Shipping Corp.*,

361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), and quoted the Supreme Court:

The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause.... The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all the circumstances, including the medical testimony into consideration. Though this case involves a medical issue, it is no exception to the admonition that, "It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. * * * The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable." (Footnotes and citations omitted).

*Foltz,* 689 S.W.2d at 717 (quoting *Sentilles,* 361 U.S. at 109–10, 80 S.Ct. at 175–76).

With these standards in mind, our review of the record reveals the following evidence. Roth called Dr. Richard Wendt, an orthopedic surgeon as his expert medical witness. Roth had visited Dr. Wendt in July 1990 by referral from his family physician. Dr. Wendt took a medical history from Roth which included information that Roth was a trackman for the railroad; he built and maintained railroad track; his job required heavy lifting, sometimes up to 250 pounds; and

while doing heavy lifting in early May of 1990, he injured his back which caused low back pain and left leg radiation that became progressively worse. Based on his examination and subsequent treatment of Roth, Dr. Wendt diagnosed Roth's back condition as a herniated disk.[4] At trial, Dr. Wendt testified repetitive bending, stooping, and heavy lifting activities are a cause of a ruptured or herniated disk. He also testified to a reasonable degree of medical certainty that the incidents of lifting in early May of 1990 were compatible with Roth's herniated disk. Dr. Wendt clarified his medical opinion and further testified Roth suffered a progressive injury resulting from his pattern of heavy lifting; "what he was doing [heavy lifting] ... did cause a herniated disk." From this evidence and all reasonable inferences able to be drawn therefrom, the jury could reasonably conclude that Santa Fe's negligence on May 8, 1990 did in some way cause, whether in whole or in part, Roth's injuries. As a result, the trial court did not err in denying Santa Fe's motion for j.n.o.v. This first point is denied.

As its second point, Santa Fe alleges the trial court erred in giving Roth's verdict directing instructions (submitting the four grounds of negligence discussed, *supra*) because they were not fully supported by the evidence. Specifically, Santa Fe contends Roth failed to adduce any evidence of the following: 1) Santa Fe failed to provide reasonably safe appliances for Roth to manually remove crossing planks on May 2, 1990; 2) Santa Fe failed to provide reasonably safe appliances or reasonably adequate help for Roth to perform "spiking work" on May 8, 1990.[5] This point is without merit as we have already determined there was an evidentiary basis for the jury's conclusion.

For its third point, Santa Fe contends the trial court committed error by submitting Instruction Nos. 8, 9, 10, 12, 13, 14, and verdict forms A and B because such instructions violated the due process, equal protec-

---

4. Technically, the diagnosis was a "herniated nucleus pulposus"—a herniation at the left L4 lumbar spine.

5. Santa Fe misconstrued Roth's petition and the evidence at trial and has limited its argument to Roth's "spiking" activities (driving spikes to secure rails) on the afternoon of May 8, 1990.

However, the Petition alleges, and the evidence established, that Roth was initially injured on that date while manually removing crossing planks, although he did not report the injury until later in the day at a time when he was driving spikes. Santa Fe completely disregards this evidence in its argument.

tion, and supremacy clauses of the United States Constitution and the due process and equal protection clauses of the Missouri Constitution. Santa Fe further alleges the trial court erred in refusing its tendered instructions CC, DD, EE, FF, GG, HH, II, and JJ. Santa Fe complains, in particular, that the instructions did not allow the jury to record findings as to percentages of fault between the parties as in all other Missouri comparative fault cases, and as a result, Santa Fe is denied meaningful appellate review.

■ Essentially Santa Fe challenges the substance of the instructions for FELA cases as set forth in MAI. At the outset, we acknowledge strict adherence to MAI instruction forms and "Notes on Use" is required by our Supreme Court and recall its admonition that "[i]f this court is to make this system work, and preserve its integrity and very existence, we must insist that mandatory directions be followed and that the pattern instructions be used as written." *Davis v. St. Louis S.W. R.R.*, 444 S.W.2d 485, 489 (Mo.1969). As such, extended discussion of this issue is unwarranted. First, Santa Fe disputes the propriety of giving Instruction Nos. 8 and 12 (Roth's verdict directors) based on MAI 24.01 and denying tendered instructions EE and FF.[6] In addition, Santa Fe objects to the submission of Instruction Nos. 10 and 14 (Roth's damage instructions) based on MAI 8.02 and rejecting tendered instructions II and JJ.[7] Our supreme court in *Bair v. St. Louis–San Francisco Ry.*, 647 S.W.2d 507 (Mo. banc 1983), clearly disposes of Santa Fe's attack on these instructions. In *Bair*, the court held the submission of MAI 8.02 was "mandatory to the exclusion of all others under the MAI," and "[t]he submission of MAI 24.01 was proper, and in fact required under Supreme Court Rule No. 70.02(b)." *Id.* at 510–11. As for Santa Fe's remaining allegations of instruction error, we note that Instruction Nos. 9 and 13 (affirmative defense-contributory negligence) and Verdict Forms A and B are applicable to Roth's FELA action and were drafted in

strict compliance with MAI. "If a Missouri Approved Instruction is applicable, such instruction must be given to the exclusion of all others." *Gilliam v. Chicago & N.W. Transp. Co.*, 859 S.W.2d 155, 161–62 (Mo.App.1993) (citation omitted); Rule 70.02(b). As a result, the trial court did not err in rejecting Santa Fe's tendered instructions CC, DD (verdict forms), GG, and HH (affirmative defense-contributory negligence).

■ Finally, as Santa Fe acknowledges in its brief, "this court[ ] has limited authority to ignore approved instructions in Missouri." On this issue, Santa Fe is correct. As stated, *supra*, we are bound to follow our Supreme Court's directions. The instructions submitted by the trial court have been approved by the Missouri Supreme Court and are mandatory. We have no authority to alter this point of law. Therefore, Santa Fe's remaining allegation that its constitutional rights were violated is merely colorable, not substantial, and we need not address it. Santa Fe's final point is denied.

The judgment is affirmed.

All concur.

---

6. Santa Fe's tendered instructions EE and FF proposed to add the phrase, "in your Verdict A [and B, respectively] you must assess a percentage of fault to defendant," at the beginning of the instruction.

7. Santa Fe proposed additions to the submitted instructions that directed the jury to identify a percentage of fault for both parties and state Roth's total amount of damages, leaving the judge to compute Roth's final recovery.